Hunt vs. Printup.

Judgment affirmed.

---

## HUNT vs. PRINTUP.

An attorney at law is not liable to an action at law who acts *bona fide* in the discharge of the ordinary duty of an attorney, and especially in directing a levy on property which the plaintiff admits in a consent decree subsequently made by a court in chancery, was subject to the payment of this identical debt.

Trespass, from Floyd county.    Nonsuit, by Judge HAMMOND, at August Term, 1858.

This was an action of trespass brought by Warrington Hunt against Daniel S. Printup, Esquire, an attorney at law, for unlawfully levying upon and seizing and taking possession of about ten negroes belonging to plaintiff.

under and by virtue of an attachment sued out in favor of one Martin Ketzmiller against Jacob Davault.

At the trial, plaintiff proved by the deputy sheriff and jailer, that the attachment was placed in his hands by Col. Stewart, with instructions to levy the same on the negroes mentioned—the negroes were pointed out by Col. Stewart, (the eleven negroes, at the time they were levied on, were in the possession of the plaintiff, Hunt)—he took the negroes to Rome and put them in jail. Printup, Smith, and Shropshire were the attorneys for Kitzmiller. On his return to Rome with the negroes, witness informed the attorneys that he had made the levy and had the negroes—they told him to hold on to them and keep them safe. Witness put the negroes in jail and kept them there for some time. The attachment is in Printup's hand-writing.

Plaintiff then offered the attachment and proceedings therein, and also a certified copy of the record of a suit in chancery, in the State of Tennessee, in which Martin Kitzmiller was complainant and Warrington Hunt and others defendants.

George H. Davault was sworn on the part of plaintiff, and testified that the negroes were worth ten thousand dollars—were attached in Floyd county in the spring of 1854; they were detained eight or nine months—they were hired before at $75 per month—witness was interested in them. Witness and General Milligan got possession of the negroes as the agents of the plaintiff and the Bank of Tennessee—obtained possession by paying Printup and Smith two hundred and fifty dollars, and Shropshire one hundred dollars, and costs and other expenses—thinks the damage and loss sustained and money paid out amounted to four or five thousand dollars. Plaintiff paid witness five hundred dollars for aiding as his agent in the matter. Paid Underwood and Mitchell two hundred dollars—paid Kitymiller's lawyers,

Priutup, Smith, and Shropshire, $350, besides other expenses, the amount of which witness does not recollect. Does not know what it cost plaintiff in coming in person to attend to said case—knows the negroes were the property of the said plaintiff, because the plaintiff and witness bought them jointly, and owned them some two years, then witness sold his interest, which was one half, to plaintiff, while the negroes were in North Carolina.   All the witness knows about the seizing and detaining of the negroes by defendant, is what transpired when he was in Rome, January, 1855, when he was endeavoring to make a sale of some of said negroes to pay the expenses, in order to get possession of the negroes.   The jailer, who was acting as deputy sheriff, came to witness when he was looking at the said negroes and trying to affect a sale, and asked what that maneuvering meant among them negroes, and said the defendant had sent him to see about it.   That witness had better see defendant; that it would save trouble and costs.   Witness went to see defendant in his office, and asked him by what authority he had sent the deputy sheriff after him?   Defendant replied that he had authority, and it was a good deal his business. That he stood responsible for a large amount.   Witness replied that he came here as the authorized agent of the plaintiff, and if defendant wished to see his authority, he could shew it to him.   Defendant replied that he thought that witness ought to have come to him in the first place, but that witness could go and attend to the business.

He paid the amount stated, of $350, lawyers' fees; besides court costs and other expenses, which witness does not now recollect.   It was something over six hundred dollars.   These sums had to be paid before witness could get the possession of the negroes ; defendant would not agree to let the case be dismissed, or that the negroes should be carried off without further expense and trouble,

until the fees mentioned, and court costs and expenses, were paid.

*Cross-Examined.*—Witness answers that he does not know by whom said negroes were actually seized and stopped. Witness was in North Carolina at the time said negroes were taken possession of, and is brother-in-law to plaintiff.

Witness and plaintiff did own said negroes jointly. Plaintiff told witness that he moved said negroes from Tennessee, in order to effect a compromise with the Bank of Tennessee. That he did not owe Kitzmiller anything. Witness sold them and Gen. Milligan signed the bill of sale, as he was authorized to do so by a decree in the chancery court of Tennessee, except four negroes, which were delivered to plaintiff with $400 or $500 left after paying the debts and expenses. The chancery court did decree them to be sold for a debt owing to the Bank of Tennessee, and not to Kitzmiller as plaintiff's property. I know nothing about his passing under an assumed name. What I have answered from having heard I state. The remainder of answers are from my own knowledge. It was in defendant's office when the conversation with him took place. Daniel Hieskell and Mr. Browder were were present—do not know the others. In January, 1855, do not know where the plaintiff was taking said negroes to, when they were seized first—saw defendant in January, 1855. The negroes were taken the spring before—do not know the precise date. Witness sold some of the negroes in Monroe county, Tennessee, and the proceeds of said sale went to payment of the debt owing to the Bank of Tennessee, and the expenses, lawyers' fees, &c., above mentioned; for which Hunt received a credit on his note, except the $400 or $500 which was turned over to Hunt with the balance of the negroes.

Do not know anything more than I have stated about defendant's seizing said negroes—was not in the State of

Georgia when said negroes were attached—do not know where defendant was when said negroes were attached.

Have answered where and when I saw defendant. Said negroes belonged to Hunt. There was first a bill of sale to one half interest in them, and then my bill of sale for the other half. I did not swear in a bill in equity that said negroes were in my possession when they were attached in Georgia—there was one levied on or attached when I was here—a child in my arms at the time, for a claim in favor of Duke, I think, which was afterwards dismissed. The case was settled by paying the costs and fees before stated, and not by paying any portion of the debt, for which they were attached. The proceeds were applied as before stated.

They were not. There was no bill for the same debt, upon which they were attached in Georgia that I can hear of. The sale and proceeds of sale have been answered. Do not know of the parties to the bill of the Bank. Hunt agreed to said settlement, but not satisfied with it. Witness and Milligan were appointed to sell said negroes. Except that of the Bank of Tennessee and what we paid in Georgia, was upon our own responsibility. I owned an interest in said negroes as heretofore stated—bought it from Jacob Davault.

No person, except the persons writing my answers, was present during the taking of my interrogatories. The attornies, nor none else have ever told me, and said how I should answer these interrogatories. I have been informed that the first was defectively executed, and was sent back to be re-executed, but never reached me, and plaintiff asked me to come in person to court.

Plaintiff then offered in evidence, the attachment, bond, and entries thereon, and closed.

Defendant moved for a non-suit, on the ground that the evidence did not make out a *prima facie* case against him; or one which would authorize the court to submit

it to a jury.   The court granted the motion and ordered a non-suit, and plaintiff excepted.

UNDERWOOD & SMITH, for plaintiff in error.

PRINTUP & SHROPSHIRE, *contra*.

*By the Court.*—McDONALD, J., delivering the opinion.

In looking through the voluminous record before us, we are satisfied that the presiding judge in the court below committed no error in awarding a non-suit in the cause in that court.   It appears that the defendant was sued in an action of trespass, for an act performed as attorney at law, in the performance of an ordinary duty, and for aught that appears in the record, his conduct was *bona fide*, without any mixture of intentional wrong; if, indeed, there was any wrong.   In the case of Sedly vs. Sutherland and others, 3 Espiness Rep. 202, Lord Kenyon said that he " thought the action could not be maintained against attorneys, unless it could be proved that they had gone beyond the line of their duty, by which the plaintiff had suffered.   That it would be a case of infinite hardship, if an attorney, who was instructed to use the most effectual means to secure parties suspected, should be subject to actions of trespass, in the fair discharge of his duty."   The action in that case was for the arrest of the person ; in this, for the levy on property, or directing it, or ordering the officer to hold on to property already levied on.   There were statements made by counsel for defendant in error in the argument not found in the record, and therefore not noticed in our judgment ; but the evidence adduced by the plaintiff shews that he and his counsel, in a corut of chancery in Tennessee, in a consent decree, admitted that the proceedings in this State, alluding to the said attachment, were taken to subject the

Hunt vs. Printup.

slaves levied on, and referred to in said decree to the satisfaction of the Tennessee judgment; and assenting also, that said slaves should be sold, or so many of them as should be sufficient to satisfy said judgment, and admitting the validity of the proceedings here by consenting to a decree that all the costs of the suit which had accrued in the State of Georgia should be paid from the sale of the negroes, the said decree at the same appointing, commissioners to come to Georgia, receive the property and execute that part of the decree,

We think that plaintiff in error, by his own evidence, so far from sustaining his case, shews that he had no ground for instituting the proceeding.

Judgment affirmed.